UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF CALIFORNIA

**FILED**

Jamie Osuna, CDCR # BD0868
CSP-COR
PO Box 3476
Corcoran, CA 93212
Pl.,

against

Olivia LaVoice
KGET17 News
Nexstar
Defs.

Docket No.: **1:24-cv-01122-KES-SKO**
Third Amended Complaint
State Prisoner

FEB 20 2025
CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

**DEMAND FOR JURY TRIAL**

**COMPLAINT FOR DECLARATORY
INJUNCTIVE AND FURTHER RELIEF,
COMPENSATORY AND PUNITIVE
DAMAGES**

For violations of/under:
1. **CA Civ. Code § 45**
2. **Cal. Const., Art. 1, § 1; Privacy Clause**
3. **CA Civ. Code § 3344**
4. **CA Civ. Code § 56.36(3)(A)**
5. **Restat. (Sec.) of Torts § 652(E)**
6. **Civil Harassment**
7. **CA Civ. Code § 1689**
8. **Copyright Infringement**

**STATE SUPPLEMENT**

**RECEIVED**

FEB 20 2025

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

## I. JURISDICTION & VENUE

1. This Court has original Federal Question jurisdiction of Plaintiff's action under 17 U.S.C. § 501, et seq., (Copyright), and 28 U.S.C. § 1338(a). This Court is empowered to grant injunctive relief pursuant to Fed. R. Civ. P. 65, declaratory relief under 28 U.S.C. § 2201, further relief under 28 U.S.C. § 2022, and may exercise supplemental jurisdiction under 28 U.S.C. § 1367.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, actions, omissions giving rise to Pl.'s claims occurred in the Counties of Kings and Kern, CA, which are within this judicial jurisdiction.

## II. INTRODUCTION

3. Plaintiff (Pl.) is a pro se, CSP-COR prisoner in proceedings for potential death penalty case 19CM-1882. Pl. brings this complaint seeking remedies for injuries from defamation (libel), copyright infringements, privacy invasions, use of likeness, disclosure of private medical

1                                                        *OSUNA V. LAVOICE, ET AL*

1    information, false light placements, harassment, and in seeking recission of consent/contract.

2    4. Pl. alleges Defendants (Defs.) published around 250 inaccurate, libelous, or misleading

3    materials, including an almost 4-hour biography podcast about Pl. *Man with a Thousand Faces*

4    (*MWATF*.) In a recorded prison call, Pl. put Def. LaVoice on notice of inaccuracies, lies, inter

5    alia, in Defs.' works on Pl. Defs. never issued corrections or retractions.

6    5. Under registration case nos. 1-14736572771, 1-14734282953, 1-14734254275, 1-14767108071,

7    1-14778251341 Pl. owns exclusive copyrights. Pl. alleges Defs. violated said copyrights for

8    non-news *MWATF*, other works, including Def. LaVoice's social media.

9    6. Pl. alleges Def.'s actions severely affect Pl.'s daily life in CDCR—staff allegedly withheld

10   treatment from Pl., inmates threatened Pl. Defs.' local audience—Pl.'s jury pool—demanded Pl.

11   be tortured/killed, doxed Pl.'s family, pre-determined Pl.'s guilt and death penalty sentence.

12   7. Pl. was a private citizen/not known beyond other common citizens in court proceedings prior to

13   Defs. publishing hundreds of inflammatory materials on Pl.

14   8. Due to schizophrenia-type mental illnesses, being a SHU/RHU inmate and under PC 2602, Pl.

15   received help in the research for and transcribing/writing of this complaint.

16                                          **III. PARTIES**

17   9. Pl. Jamie Osuna is incarcerated at CSP-COR, Corcoran, CA.

18   10. Def. O. (Olivia) LaVoice 2015-2019 was a KGET17 reporter. Def. resides in Kirkland, WA.

19   11. Def. KGET17 (TV News), a media company, has stations in Kern/Kings County, CA.

20   12. Def. Nexstar, a media company, is the license/permit holder for KGET17, and is in Irving, TX.

21   13. Def. J/J. (John/Jane) Does were/are KGET17/Nexstar employees.

22                                   **IV. FACTUAL ALLEGATIONS**

23   14. 08/27/2024, Def. LaVoice published Pl.'s mugshot next to the headline "murders of children"

24   are the worse cases she covered. Def. omitted Pl. is not a child killer. [Exs. C-10; B, row 2.]

25   15. 2017-2024, Defs. KGET17, LaVoice headlined Pl. around fifty-eight times as "convicted

26   murderer," "notorious convicted killer," "Kern's tattoo-face killer," "notorious Kern killer,"

27   "Man with a Thousand Faces," "murderer." Defs. headlined Pl.'s alleged victim (convicted of

28   murder) only as "cellmate" or omitted mention of that individual.

*OSUNA V. LAVOICE, ET AL*

1   16. 2019-2024, around 122 Defs.' materials referred to Pl. with inflammatory names throughout

2   the body/text: "Man with a Thousand Faces," "monster," "notorious Kern County torturer,"

3   "convicted Kern County murderer," "convicted killer," "notorious convicted murderer," "Kern

4   County murderer," "convicted murderer," "murderer," "confessed killer," "senseless killer,"

5   "notorious Bakersfield killer," "one of Central Valley's most notorious killers," "remorseless

6   killer." Defs. referred to Pl.'s alleged victims as "man," "cellmate," "inmate," "woman," or by

7   their legal names. Defs. allegedly sensationalized Pl.'s crimes, used descriptors "grisly,"

8   "gruesome," included details in conflict with official documents, omitted facts favorable to Pl.

9   Defs. omitted alleged victims' charges or mentioned these without detail.

10  17. Around 10/31/2019, Defs. published *MWATF,* an unauthorized, **non-news** podcast about Pl.

11  Defs. allegedly published native ads against FTC policy for *MWATF*. Defs. published around

12  213 materials on/after *MWATF's* release, with around 129 advertising *MWATF*. Defs. presented

13  *MWATF* as news or "for more [information] on [Pl.]" Native ads included banners, clips,

14  disguised news links, topic specials, backdrop photos, naming Pl. "MWATF." [Exs. E-1-E-3.]

15  18. Def. KGET17 published article "The Grisly Crimes of 'MWATF.'" It had no new news in it

16  and was allegedly an ad for *MWATF*. Def. published it around seven times. [Exs. A, rows 17,

17  18; B, rows 34, 41-44.] Def. Nexstar published it at least eighteen times across several stations.

18  19. Passive research conducted for this complaint showed personal ties between Pl.'s alleged

19  victim Y. (Yvette) Peña's family and Def. LaVoice, Def. KGET17's staff. Y. Peña's sister, D.

20  (Danielle Peña Gonzales) Baltierra had at least one child with news cameraman Johnny

21  Guillen, friend to KGET17 reporter J. Kotowski, other staff. D. Baltierra posted to Def.

22  LaVoice, "Thank you for your friendship." [Ex. D-2.] Def. LaVoice and D. Baltierra later

23  participated in an allegedly defamatory interview about Pl. on *Sword and Scale*.[1] Defs. omitted

24  their personal connection with the Peña family. Defs. omitted nearly all damaging information

25  about the Peña family from their coverage while allegedly vilifying and dehumanizing Pl.

26  20. Omissions include some of the Peña family being in the Lomita Bakers gang, their felonies.

27  _____

28  [1] Site/source: https://www.swordandscale.com/listen/episodes/PLUS-83

*OSUNA V. LAVOICE, ET AL*

1    Def. LaVoice featured one family member in a video, omitted the gang, stated it was

2    "unbelievable how much [death] one family can have to endure." [Ex. D-1.]

3    21. Def. KGET17's staff published their personal feelings on Defs.' official materials: "Olivia and

4    I did this story. [Pl.] is the poster child for evil;" "I did a jailhouse interview with this evil

5    bastard;" "I would have slugged this 'The Making of a Monster;'" "He's bat shit

6    crazy…'We're going to pump sunlight to him.'" [Exs. F; Ex. B, rows 127, 132.]

7    22. Def. LaVoice conducted *MWATF* interviews with single, pseudonymous, and known

8    perjurious sources who allegedly provided defamatory, derogatory, contradictory statements

9    about Pl. Def./Defs. omitted opposing viewpoints. Pl. was not asked to participate.

10    23. In a short interview clip, Def. LaVoice stated to Pl.'s brother, "You realize that a lot of people

11    think your brother is evil, right?" (*MWATF*, Episode (E)5, TS 30:05-30:08.)[2] Pl.'s brother

12    responded, "I think they only think that because of his appearance." (*Id.,* TS 30:12-30:14.) Def.

13    listed what *must* make other people find Pl. evil. Def., in an extensive interview with D.

14    Baltierra, characterized Y. Peña as a "sweet-hearted, giving person." (*Id.,* E4, TS 13:42-13:47.)

15    Def. stated of Pl.'s abusive childhood, "As far as making [Pl.] into a victim—that's not how we

16    see him." (*Id.,* E3, TS 39:01-39:05.) Defs. referred to Y. Peña as a "true victim."

17    24. Def. LaVoice published it was "attention [Pl.] craves." (*Id.,* E1, TS 24:59-25:02.) Def. stated,

18    "[Y. Peña] was plagued by the need to feel loved." (*Id.,* E4, TS 36:21-36:23.) Def. compared a

19    bloody murder scene to Pl.'s smiling, grade school photo taken against a paint-splatter

20    background. (*Id.,* E3, TS 2:29-2:56.) Def. stated the "brief time [Pl.] spent as an adult living

21    outside of a jail cell, [Pl.] wreaked havoc, violence, and terror on many;" and likened Pl. to

22    serial killers, "a monster." (*Id.,* E2, TS 31:40-31:48; E3, TS 31:30-32:29.) Def. stated "[Pl.] was

23    consumed by something very different: hate." (*Id.,* E4, TS 36:23-36:28.) Def. stated looking at

24    Pl. is "like driving past an awful car wreck." (*Id.,* E1, TS 7:52-7:58.) In contrast, Def. published

25    Y. Peña was "very beautiful," and if "you met her, you loved her." (*Id.,* E1, TS 22:08-22:13.)

26    25. Def. LaVoice interviewed inmate Marcus Hume AM7003 as "Billy" whose interview was

27    _____

28    [2] Site source: https://www.youtube.com/watch?v=Wws9bIv6W7k&list=PLnRJFieQmOOyDnjCFhz-Ma-peIVXiUJmw

*OSUNA V. LAVOICE, ET AL*

1   allegedly in exchange for a prison transfer, arranged for with/by Def. Def. omitted this

2   information. After Billy's transfer, he stopped the interview. Def. omitted this information.

3   During a recorded prison call, Def. stated to Pl., "It looks like [Billy] only wanted a transfer."

4   Defs. did not remove Billy's *MWATF* interview. Defs. did not issue any corrections/retractions.

5   26. Def. LaVoice presented Billy as being one of the "only ones on the inside" to have information

6   on Pl./19CM-1882. (*Id.*, E6, TS 0:44-0:50.) Def. published Billy stating 19CM-1882 was a "set

7   up." (*Id.*, E6, TS 10:54-10:56; 16:03-16:07.) Def. published Billy stating, "What I know for a

8   fact, when [Pl.] was in New Folsom [prison], [Pl.] told ICC, he told the committee, 'I'm gonna

9   kill the cellie [cellmate], I'm gonna kill him;'" "[Pl.] was in New Folsom and told the

10  committee, 'I'm gonna kill a cellie—watch!'" (*Id.*, E6, TS 31:56-32:05; 32:26-32:31.)

11  27. Def. knew Billy was not in New Folsom with Pl. Pl. put Def. on notice in a recorded prison call

12  that the committee had been run without Pl. Def. omitted these facts.

13  28. Def. LaVoice published Billy stating Pl. was "very calculated," "manipulative." (*Id.*, E6, TS

14  14:28-14:44.) Def. published Billy stating Pl. was "not liked by the guards in [there];" that

15  "every inmate in [there] knew [Pl.] was gonna kill somebody;" that Pl. is "looked down upon"

16  by fellow inmates, "shunned" over Y. Peña (sister to Def.'s friend D. Baltierra.) (*Id.*, E6, TS

17  16:07-16:28; 35:36-35:40; 36:27-36:28.)

18  29. Def. LaVoice interviewed Pl.'s ex-wife Joelle Castellano as "Jane." Def. published Jane met Pl.

19  at Jane's underage drinking party through Jane's nephew Jason Britt. Def. published Pl. stabbed

20  someone for dancing with Jane, and that Pl. was arrested. Def. stated Pl. started "courting Jane

21  from behind bars." (*Id.*, E2, TS 4:06-5:38.) Pl. put Def. on notice that Pl. and Jane met and were

22  sexually involved *before* the house party, the man at the party had been destroying their

23  property when Pl. confronted the partygoer. Defs. issued no corrections, no retractions.

24  30. Def. LaVoice stated Pl. was arrested for domestic violence. (*Id.*, E2, TS 12:17-12:37.) The

25  attorney Jane hired for Pl. swore under oath Jane had recanted her story, had made her

26  accusation only in anger. Def. omitted these facts. Def. had access to the records through the

27  lawyer, court, Jane, or Pl. Def. omitted the harassment cases, restraining order requests others

28  filed against Jane. (See BFL-17-004871, 2017; BCV-15-101375, 2015; S1500CV282387, 2014;

*OSUNA V. LAVOICE, ET AL*

1     Kern County Superior Court (KCSC).)) Def. had access to the public court records.

2   31. Def. LaVoice published that "No one—including Child Protective Services—ever thought

3     Yvette was abusive or neglectful." (*Id.,* E4, TS 14:50-14:55.) Def. omitted the domestic

4     violence restraining order renewed through years against Y. Peña and her custody loss. (See

5     <u>S1501FL601148</u>, Monsibais v. Peña, 2007-2011, KCSC.) Def. had access to court records.

6   32. In contrast, Def. LaVoice stated Pl. shoved Jane's child "off the bed, staring into [Jane's] eyes

7     waiting for the response from her he craved." (*Id.,* E2, TS 13:27-14:05.) Pl. had not done this or

8     in any way harmed a/the child. Pl. was never charged/arrested or convicted for such a crime.

9   33. Def. stated, "[Pl.] was taunting [Jane], stalking her. He'd be outside her window but gone before

10     any law enforcement ever showed up, making Jane look delusional, paranoid. It was a game that

11     [Pl.] was winning." (*Id.,* E2, TS 16:35-16:49.) Pl. had not done this. Def. omitted Jane's arrests

12     for drugs that cause delusions, paranoia. Def. had access to public arrests records/charge.

13   34. Def. LaVoice stated, "For months, [Pl.] called Child Protective Services on Jane multiple times

14     a day, telling them outlandish stories to get her kids taken away, and, of course, he continued to

15     call Jane threatening her, telling her he'd get his revenge." (*Id.,* E2, TS 23:42-23:57.) Def. stated

16     Child Protective Services had "showed up at Jane's door but they weren't there because of

17     [Pl.]—at least it didn't seem so," that a child reported Jane struck him and police arrested Jane

18     for "misdemeanor for child cruelty." (*Id.,* E2, TS 26:56-27:08.) The official reports showed

19     police responded to a neighbor's call about a young child alone in the streets at night. The child

20     was removed from the house. Jane was arrested and charged for cruelty to a child, drugs. (See

21     <u>BM810457A</u>, 2012, KCSC.)

22   35. Def. LaVoice did not request/get these records from Jane or Pl. Def. told the audience that

23     family court records are sealed. Pl. had put Def. on notice that Jane lost custody of multiple

24     children multiple times completely unrelated to Pl. Def. omitted this information.

25   36. Def. LaVoice published Jane's lie without any supporting evidence that Pl. arranged via guards,

26     female inmates to assault Jane. Pl., who has a child with Jane, was on the same jail transport bus

27     as Jane via the family court summons arising from Jane's case <u>BM810457A</u>. A female inmate

28     heard Jane's charges in the court, allegedly attacked Jane over it. Def. omitted this information.

                                     *OSUNA V. LAVOICE, ET AL*

1    37. Def. LaVoice published Pl. mailed a dead rat to Jane. Def. omitted it was not proven, omitted

2    how it would have passed jail mailroom censors. Def. omitted Jane was on jail-recorded calls

3    trying to set-up Pl. Def. instead published Pl. was "very resourceful in the pursuit of getting

4    what [Pl.] wants." (*Id.*, E2, TS 25:18-25:21.) Def. omitted Jane gave the envelope to the District

5    Attorney's (DA's) Office, not police. Def. omitted DA Andrea Kohler was personally vouching

6    for Jane as a "good mother" with a "clean house" around the time Jane had been arrested for

7    drugs, child abuse. The envelope was lost. Defense filed a motion to recuse DA Andrea Kohler

8    for the alleged losing of alleged evidence and for "inserting" herself into the case to vouch for

9    Jane. (See BF139419A; *in limine motion* # 23; 3/27/2017.) Def. omitted these facts. Def.

10   described being in court when the motion was filed. (*Id.*, E1, TS 13:13-13:35) (2024; Matthew

11   Cox[3], TS 1:08:15-1:08:25.) 04/28/2017, Def. received a copy of *in limine motion* # 23.

12   38. Allegedly, Def. LaVoice presented contact with Pl. so that it was likely to seem as Pl.'s one-

13   sided, unwanted attention/pursuit. This includes Def. stating Pl. viewed himself as the "real-life

14   Joker" comic book character, agreeing with the audience that Pl. viewed Def. as Harley Quinn.

15   Def. stated Pl. could be attempting to "pique" Def.'s interest in Pl. (*MWATF*, E5, TS 32:09-

16   32:10.) Def. stated, "it was a little creepy to hear his ex-wife say this, 'He told me he totally

17   enjoyed your interview, looking at you, being in your company, you smell good;' but when she

18   told me to be cautious about him getting me to believe certain things, perhaps to keep me

19   interested in [Pl.], it struck a chord in me." (*Id.*, E5, TS 31:32-31:52.)

20   39. Pl. had not stated this. Def. was on notice Pl. and Jane had not been in contact since 2012/2013

21   with Jane acting as a state witness against Pl. Def. had access to court documents and Jane's

22   other statements about Pl. in *MWATF*. Def. failed to address Jane's contradictions and instead

23   alluded to the lie, "Close enough for him to smell my perfume." (*Id.*, E1, TS 11:31-11:33.)

24   40. Def. LaVoice repeatedly likened Pl. with the Joker, that the "Joker is a part of [Pl.'s] identity."

25   (*Id.*, E5, TS 41:20, 25:43, 25:51-25:53, 27:13, 27:19, 27:34, 27:49, E2, TS 7:00-7:03, 15:00-

26   15:01.) Def. stated, "[Pl.] really thinks he's the real-life Joker;" "The fifth episode [of *MWATF*]

27   _____

28   [3] Site source: https://www.youtube.com/watch?v=zk42c5eC-CM&t

1  focuses on, um, the, on, some other unsolved murders that [Pl.] could be connected to, um, you

2  know, some of the things he has said. We also focused on his, um, obsession with the Joker."

3  (2024; Matthew Cox; TS 0:00-0:03; 1:01:06-1:01:08; 1:22:53-1:23:12.) Def.'s audience stated

4  Pl. thought of Def. as Harley Quinn. Def. allegedly encouraged this comment, stating,

5  "Something like that," with a hand-smacking-forehead emoji. [Ex. C-13.]

6  41. Def. LaVoice stated, "I've written to [Pl.] recently asking him to consider telling me more about

7  these two murders." (*MWATF*, E5, TS 43:12–43:17.) Def.'s 2020 *Sword and Scale* interview

8  stated, "[Def.] wants to keep the communication open [with Pl.]" (TS 45:51-45:54.) 01/19/2022,

9  Def. sent Pl. a JPay email, seeking a response. [Ex. G.] Def. later stated, "I never did write [Pl.]

10  I never did write him a letter." (2024; Matthew Cox; TS 1:26:53-1:26:55.) Def. published Pl.'s

11  response letters/art as if they were unexpected, unprompted. [Exs. B, rows 23, 26, 31; C-12, C-

12  14, C-15.] Def. omitted she first reached out to Pl. seeking a response. Def. published without

13  explanation, "Then [Pl.] started sending me letters." [Ex. C-14.] Def. did not have permission to

14  publish Pl.'s letters/art, omitted Pl. sent them when Pl. was incompetent, under PC 2602 orders.

15  42. 01/19/2022, Def. LaVoice's JPay to Pl. stated she had "come to the conclusion that the cops

16  I've talked to are likely right, the only two murders you committed are the ones you're locked

17  up for." "I guess this is just my way of saying if you ever decide you do want to talk about other

18  cases, feel free to drop me a line." [Ex. G.] Pl. did not respond to Def.

19  43. Around 10 months later, Def. allegedly associated Pl. with unsolved murders, publishing,

20  "Investigators looked into the info, but I truly think more could be done. The law enforcement

21  agencies involved are overloaded and understaffed." [Ex. C-5.] Def. published Pl. "confessed"

22  to her; their 2017 interview was a "taped confession." [Exs. B, rows 24-26, 31.] (2024; Matthew

23  Cox; TS 1:06:58-1:07:08.) Def. indicated she cut contact with Pl. in 2020/2021 because it was a

24  "cat and mouse game." (2024; Matthew Cox; TS 1:27:25-1:27:27.) [Exs. B, rows 26, 31; C-12.]

25  Def. omitted she debunked Pl.'s interview claims in *MWATF*. Def. omitted her JPay.

26  44. Def. LaVoice stated, "This [cold case] overall doesn't fit [Pl.'s] known M.O." (*MWATF*, E5, TS

27  40:12-40:15.) Def. stated, "No matter how likely it could seem to investigators that [Pl.] was

28  lying to me about the two additional murders, I've found police reports from his 2011 arrest...

1    within hundreds of pages there's one line that jumps out at me." (*Id.,* E5, TS 42:29–42:42.) Def.

2    persisted Pl. is/could be responsible for unsolved murders: "I really hope we can figure out if

3    [Pl.] is responsible for other murders;" "The possibility [Pl.] is responsible for cold cases, which

4    is a topic I've wanted to bring more attention to for a very long time;" "And to explore possible

5    unsolved murders [Pl.] could be responsible for." [Exs. C-8a, C-8c.]

6    45. Allegedly, Def. LaVoice, with others, confronted/intimidated empathetic portrayals of Pl. Def.

7    positively engaged with portrayals that allegedly presented Pl. as evil. Danielle Kirsty published

8    a more empathetic biography about Pl.[4] Her video description cited *MWATF*. Def., her former

9    KGET17 colleague J. Franco, others, posted on Danielle Kirsty's video around the same

10    time/date under the alleged guise of copyright infringement. Some told viewers to watch Def.

11    instead of Danielle Kirsty. The posts were deleted. Def.'s 2024 Matthew Cox interview then

12    used Danielle Kirsty's 2021 video title. Naming Def.'s interview the same title as Danielle

13    Kirsty's video enabled the YouTube algorithm to suggest Def. instead of Danielle Kirsty.

14    46. Def. did not post like this on other works not crediting *MWATF/*Def. *but* allegedly presented Pl.

15    as evil. Def. positively engaged with content that had an alleged narrative of Pl. being evil:

16    06/11/2021, Def. published to one video, "When I interviewed [Pl.], a part of me felt like I was

17    in the room with the devil himself, which is definitely what [Pl.] wanted." [Ex. C-9.]

18    47. Around 08/28/2024, Def. LaVoice published Pl.'s jail picture, stating she "stopped keeping

19    tabs" around "several years ago" on Pl./19CM-1882. [Exs. B, row 1; C-11.] 12/13/2023, Def.

20    published a (Def. KGET17's) group photo of D. Baltierra attending Pl.'s resentencing hearing.

21    Def. presented D. Baltierra only as a "guidance counselor," omitted reference to her CDCR

22    job. (*MWATF*, E4, TS 38:28-38:30.) Def. omitted D. Baltierra had recently been in trouble

23    with CDCR for publishing statements about Pl./Pl.'s family, 19CM-1882 on Defs.' platforms.

24    D. Baltierra republished Def. KGET17's group photo without stating Pl.'s name/information,

25    adhering to CDCR policies. Def. LaVoice published the photo of D. Baltierra, stated Pl.'s

26    name, stated her support for D. Baltierra/Peñas. Def.'s actions enabled D. Baltierra to allegedly

27

28

---

[4] Site source: https://www.youtube.com/watch?v=ZUzpuQ7mvyo&t

*OSUNA V. LAVOICE, ET AL*

1    circumvent CDCR's policies. D. Baltierra thanked Def. in the post's comments. Defs. had not

2    contacted Pl. for comment about his resentencing hearing. [Exs. A, row 1; B, rows 4-8.]

3    48. On 10/25/2024, shortly before a 19CM-1882 hearing, Def. KGET17 published about D.

4    Baltierra's new GoFundMe to pay for a burial of Y. Peña (deceased, cremated 2011) and party.

5    Def. KGET17 advertised *MWATF* through the article and videos. [Exs. A, row 69; B, rows

6    174-178.] D. Baltierra, without actual knowledge or credible information, stated on the

7    GoFundMe that there were "strangers even reaching out to [Pl.], offering him financial

8    support," and requested money from the public.

9    49. 10/25/2024-11/08/2024, Def. LaVoice published around five times on D. Baltierra's

10    GoFundMe and encouraged her audience to donate. [Exs. B, rows 173, 179-182.] Def. stated

11    the GoFundMe was for the Peña family to "take control of [Y. Peña's] legacy," that Pl. was a

12    "monster." Def. stated people reached out, formed relationships with Pl., gave Pl. money. Def.

13    stated if someone didn't have money, "Maybe you can reach out to her family and just send

14    love and support because when you think about the fact that [Pl.] has received that and her

15    family hasn't—that's, it's just really, really, really hard to stomach." Def. had no actual

16    knowledge/credible information about Pl.'s relationships, money, or support from the public.

17    Def. had not contacted Pl. for information prior to publishing these statements.

18    50. Def. LaVoice published the public supports/favors not just Pl. but inmates in general. Def.

19    published, "convicted murders and rapists across the country…will get hundreds, some of them

20    thousands of letters and packages from complete strangers" for Christmas, that some people

21    purposely avoid victims' families at Christmas "because it's supposed to be the happiest time

22    of the year and they don't want to surround themselves with such sadness."[5] Def. stated to ask

23    any correctional guard, that when SHU inmates file lawsuits/complaints it should be taken

24    "with the proverbial grain of salt," that these inmates have "nothing but time," and Def.

25    "wouldn't necessarily disagree." (*MWATF,* E6, TS 26:22-26:38.)

26    51. 11/2022, Def. LaVoice published, "The defense attorney will not answer me on how [Pl.'s]

27    _____

28    [5] Site source: https://www.instagram.com/p/C0h_-d3sm9G/

1  payment is working…So, yeah, that's happening." [Exs. B, rows 24, 25.] Def. discussed with

2  the audience how Pl.'s attorney was paid, stating Pl.'s "family is not wealthy, and no one has

3  ever helped him pay for a private attorney before." Def. acknowledged, **"Yes, you are correct!**

4  **It is not public information. I still think it's an interesting topic though,"** stated she had

5  "covered [Pl.] for many years," so she was more "invested than most." (Emphasis added.) [Exs.

6  C-1-3, C-6.] Def. deleted this comment. [Ex. I.] By 09/2024, the comment thread was deleted.

7  52. Def. LaVoice published, "I am very curious as to who in [Pl.'s] life has the $$$ for this. I don't

8  believe it's anyone who was in his life prior to him going to prison." [Exs. C-2, C-3, C-6.] Def.

9  published, "If [Pl.] does succeed in retaining private defense counsel, I am VERY interested in

10  learning where the money is coming from." [sic.] [Ex. B, row 28.]

11  53. Def. LaVoice stated of Pl.'s privileged mental health records, "I wanted to see those medical

12  documents myself, which [Pl.'s] former attorneys explained wasn't possible—those records

13  were under medical privacy laws." (*MWATF*, E3, TS 31:16-31:26.) Def. disclosed the contents

14  of Pl.'s private medical records. (*Id.*, E3, TS 30:42-31:05.) Def. stated, "I was on the phone with

15  an attorney, patiently trying to figure out how I could get [Pl.'s] juvenile record unsealed." (*Id.*,

16  E4, TS 0:06-0:12.) Def. did not seek Pl.'s consent for the records.

17  54. Def. LaVoice published Pl.'s son with Jane was from a one-night stand when the pregnancy had

18  been planned. (*Id.*, E2, TS 10:04-10:07.) Def. published the hearsay allegation Pl. had been

19  sexually molested as a child. (*Id.*, E3, TS 24:37-24:43.)

20  55. Def. LaVoice published, without Pl.'s permission, Pl.'s copyrighted private letters/art to Def., to

21  Lisa Green, et al, for non-news production *MWATF* and or her social media. [Exs. A, row 55; B,

22  rows 23, 26, 31.] (*Id.*, E2, TS 30:57-31:59.) Pl. wrote/sent the letters/art while Pl. was court-

23  declared incompetent/under PC 2602 orders and or held in higher level mental health treatment.

24  Def. LaVoice had been on notice of and omitted this information.

25  56. Around 2019, Pl.'s (former) public defender stated to Pl., "That reporter [Def. LaVoice] is

26  obsessed with you," that Def. called Pl.'s legal team/private investigator around "500" times in

27  around one month's span for information on Pl. In 2023, Def. published Def. and others

28  contacted Pl.'s new attorney and the attorney would not answer Def. or the others about Pl.'s

1    payment. Def. omitted how she knew others contacted the attorney. [Ex. B, rows 24, 25.]

2    57. To get information on Pl., Def. LaVoice contacted Pl.'s family, Pl.'s deceased stepfather's

3    family. One individual barely knew Pl. to such an extent that it "took her a minute to recall

4    [Pl.]" (*Id.,* E3, TS 17:23-17:28.) Def. communicated about Pl. with "inmates that were on that

5    same cell block [as Pl.] that, um, that found me." (2024; Matthew Cox; TS 1:17:37-1:17:43.)

6    58. Defs. KGET17, Nexstar, LaVoice, without Pl.'s consent, commercially used Pl.'s likeness,

7    copyrighted photos for *MWATF.*

8    59. Def. LaVoice interviewed Pl.'s brother and mother to tell Pl.'s neutral/unbiased story in

9    *MWATF.* Def. later stated, "I didn't want to give this murderer [Pl.] my time and attention."

10    Def. stated Pl. is a "remorseless killer, a monster of a man;" and **"I am so thankful that we**

11    **were able to tell this story the way we felt it needed to be told."** (Emphasis added.) Def.

12    stated, "I've wanted to tell Yvette's story for years;" that Def. wanted to "tell the victims'

13    stories;" *MWATF* was for **"taking the narrative away from [Pl.]"** (Emphasis added.) [Exs. B,

14    rows 131, 141; C-8a, C-8b, C-8c.]

15    60. Before/during 03/2017, Pl. was in intensive psychiatric treatment. Pl. daily took hundreds of

16    milligrams in multiple doses of antipsychotic medications. Pl.'s mental health records notated

17    Pl.'s hallucinations, delusions, disorganized thinking, problems regulating moods, self-

18    mutilation/harm, abnormal behaviors. By 2017, Pl. had around thirty-six court hearings

19    including for/pursuant to PC §§ 1367, 1368, 1370; Pl. had been court-ordered to Patton DSH,

20    inter alia. Defs. had access to CA Civ. Code § 39; court records/docket.

21    61. Around 03/24/2017, Defs. LaVoice/KGET17 had Pl. sign their consent form/contract to

22    participate in Defs.' recording/interview. Pl. registered/owns the copyright to his spoken words

23    in the interview. Pl. thought this was for a single news segment. Pl. was not granting/not

24    intending to grant permission for the interview for other uses. Defs. LaVoice, KGET17, Nexstar

25    republished/licensed, created derivative works, quoted, transcribed, advertised, distributed, inter

26    alia, the interview across various platforms. [Exs. A, Col. I; B. Col. L.]

27    62. Def. LaVoice debunked Pl.'s interview claims of murders, which she acknowledged in her

28    01/2022 JPay email to Pl., and acknowledged in *MWATF.* [Ex. G.] (*Id.,* E5, TS 36:00-36:05;

1 40:12-40:15.) Defs. later omitted this information. Defs. did not retract the interview. Instead,

2 Defs., without Pl.'s permission, featured the interview in *MWATF* E5, E3. *Sword and Scale* (a

3 non-Nexstar production) published portions of it, without Pl.'s permission. (2020, TS 12:26-

4 12:32; 13:01-13:28; 36:23-36:45; 19:03-19:34; 21:56-22:16.) Def. later described Pl.'s

5 interview as a "taped confession." (2024; Matthew Cox, TS 1:07:00-1:07:08.) [Exs. B, rows 24-

6 26, 31.] Def. published, "Yes, I will definitely make content about [the interview] down the

7 road. My podcast [*MWATF*] has a lot of info." [Exs. B, row 25; C-4.]

8 63. Def. LaVoice published D. Baltierra stating she asked, "If [Pl.] raped [Y. Peña] and when they

9 confirmed that she was sexually assaulted…" (*MWATF*, E4, TS 25:21-25:25.) Pl. had not raped

10 Y. Peña. Pl. was not charged with/sentenced for rape. Def. omitted these facts. Def. had access

11 to court records. Defs. omitted Y. Peña was a prostitute. Other media reported this information.

12 Defs. instead published Y. Peña "was a Sunday school teacher." Defs. omitted multiple DNA

13 was found at the scene, other men appeared on camera—not Pl.—entering/exiting the motel

14 room around the time then under scrutiny. Defs. had access to the court records. Instead, Def.

15 LaVoice published, "[Pl.] also tried to insinuate that if his DNA was found, it's because they

16 had consensual sex. It's always insulting to hear but something we constantly see with suspects

17 accused of murder where victims were sexually assaulted." (*Id.*, E4, TS 26:25-26:36.)

18 64. Def. KGET17 published at least 79 times on Pl.'s CDCR-expert-tested mental illnesses

19 diagnoses, that Pl. was found **not malingering**, Pl.'s incompetencies. Def. LaVoice had access

20 to this and public court documents. Def. LaVoice stated, "[Pl.'s] mental health is a complex

21 topic for me." (*Id.*, E5, TS 24:13-24:16.) Def. LaVoice published others referring to Pl. as

22 manipulative, calculated, or evil versus mentally ill throughout *MWATF*. Def. LaVoice stated

23 Pl.'s mental illnesses may be considered "another identity of [Pl.'s]." (*Id.*, E5, TS 22:33–22:38.)

24 65. Def. LaVoice published a psychologist's assessment of Pl. when he had not treated Pl. (*Id.*, E3,

25 5:40-5:51, 26:27-27:49; E5, TS 6:22-6:52.) The psychologist's statements were opposite to

26 court reports, including stating Pl. "had a lot of years to fantasize" about murder/violence, that a

27 "serial murder would have developed these kinds of fantasies." Def. omitted there were

28 deviations from court records. Def. did not cover Pl.'s actual diagnoses, sanity hearings. Def.

*OSUNA V. LAVOICE, ET AL*

1    omitted the psychologist's history of determining defendants acted with narcissism, purpose

2    versus mental illness, which was, as herein alleged, Def.'s own prevailing characterization of Pl.

3    66. Around 04/29/2019, Def. KGET17 headlined "[Pl.] admitted to killing cellmate." Def.

4    published in the article that Pl. "admitted to the grisly slaying" of 19CM-1882. Def. detailed the

5    autopsy report. [Exs. A, row 61; B, row 154.] Pl. had not made any public/court 19CM-1882

6    statements. Thereafter, the majority of Defs.' materials on Pl./19CM-1882 featured Y. Peña

7    despite that Y. Peña was not involved with 19CM-1882.

8    67. 05/02/2019, Hon. D. Tarter of Kings County Superior Court denied Def. KGET17's request for

9    19CM-1882's confidential report citing CPRA; GOV § 6252 (a)(f)(1); Cal. Const., Act VI, § 4;

10   CRC 10.500. Hon. D. Tarter set hearing date 05/31/2019, ordering Def. KGET17 to show

11   cause for release of the report. Around 05/24/2019, Kings County DA stated there was a "need

12   to preserve the integrity of evidence and [Pl.'s] due process rights," and requested the court to

13   "deny [Def. KGET17's] request," and to seal the records. Def. KGET17 skipped the hearing.

14   68. By 2019, Def. LaVoice had 19CM-1882 crime scene investigation photos. Def. LaVoice stated

15   she named *MWATF* after writing/text from Pl.'s personal art, which she saw in one of the

16   photos. Def. stated, "[Pl. had] written all over, um, the cell all sorts of things, including I

17   am…am a man with a thousand faces, **is where I got the podcast title from**." (2024; Matthew

18   Cox; TS 1:11:45-1:11:58.) (Emphasis added.) Def. stated, based on rumor/unsupported belief,

19   Pl. had done this writing/art in Pl.'s "cellmate's blood." The writings/art predated the cellmate.

20   69. Def. LaVoice hid these crime scene photos, "I'm not supposed to have them for one thing,"

21   shared them with others and detailed them. (*Id.*, E3, TS 1:49-2:02; E5, TS 19:38-19:53, 26:42-

22   26:55, 29:53-30:01; E6, TS 6:19-6:59.) Def. described these photos on *Sword and Scale* (2020;

23   TS 06:41-07:28, 7:56-08:33, 8:57-11:07), and on Matthew Cox. (2024; TS 1:11:30-1:12:12.)

24   *Sword and Scale* promoted Def.'s interview by offering these photos to the public. [Ex. H.]

25   70. Def. LaVoice omitted L. Romero's (cellmate's) CDCR-documented history of unprovoked

26   attacking cellmates, having weapons, inter alia. Def. KGET17 published around one time about

27   L. Romero's in-prison charge and thereafter, omitted it. Def. LaVoice published L. Romero

28   was "eligible for parole soon." (*MWATF*, E6, TS 22:51-22:54.) L. Romero's most recent parole

1    was denied due to his violence against cellmates/inmates, another parole hearing wouldn't be

2    held for at least 10 years, and he faced deportation. (07/09/2015; CA Parole Board Decision;

3    4:11-17; 6:21-23.) Def. had access to CA parole hearings public record.

4    71. 01/14/2022, Def. KGET17 reported an estate lawsuit was filed over L. Romero having been

5    celled with "psychopath" Pl. "in retaliation" for L. Romero filing a complaint against a

6    sergeant. L. Romero had not filed a complaint against the sergeant. Pl. filed a 42 U.S.C. § 1983

7    lawsuit against the sergeant (See 1:19-cv-00554-AWI-EPG, 02/20/2019, E.D.) Def. LaVoice

8    was aware of the § 1983. Defs. omitted Pl.'s § 1983. Def. KGET17 stopped repeating L.

9    Romero filed a complaint, issuing no corrections or retractions.

10    72. During a recorded prison call, Pl. put Def. LaVoice on notice that Defs. published inaccurate,

11    incorrect, untrue information. Def. LaVoice remained silent and didn't respond to Pl.'s notice.

12    Pl. in good faith expected Defs. to issue corrections, retractions. Defs. instead promoted

13    *MWATF* won RTDNA's Outstanding Journalism award. Def. KGET17 paid for *MWATF's*

14    entry. Defs. omitted this information. [Exs. A, rows 38, 42; B, rows 84, 85, 88, 90; J.]

15    **V.  CAUSES OF ACTION**

16    73. Directly resulting from Defs.' actions, Pl. suffered injuries/damages. Upon Pl. learning the

17    extent of Defs.' defamatory, inflammatory works, false allegations of rape, violence against

18    children/women, the audience's reactions/promotions of violence against Pl., Pl. suffered/

19    suffers severe triggering of his mental health symptoms, PTSD, other physical, psychological

20    ailments, crisis holds, as documented by CDCR medical/mental health professionals.

21    74. Directly resulting from Defs.' above-described actions, the audience/Pl.'s jury pool posted in

22    prejudice for Pl. to get the death penalty. As alleged herein, CDCR staff reacted with disgust/

23    hatred. Some withheld care from Pl. over believing Defs., repeatedly referenced Defs.' works.

24    75. Def. LaVoice engaged with some hateful posts about Pl. (including those by self-identified

25    corrections staff), thanking them for their support. Def. knowingly, wantonly, recklessly put a

26    target on Pl.'s back with other inmates when Def. published false stories that Pl. harmed

27    children, is a rapist, inter alia. Inmates credibly threatened Pl. and referenced Def.'s/Defs.'

28    work. Def. LaVoice understood the serious consequences possible for Pl. from Def. persisting

1    to associate Pl. with unsolved murders, promoting that Pl. was pre-meditated for 19CM-1882.

2    **FIRST CAUSE OF ACTION: CA CIV. CODE § 45 LIBEL & LIBEL PER SE**

3    76. Pl. realleges and incorporates paragraphs 1-75 as though fully set herein.

4    77. Def. LaVoice's actions in publishing Pl.'s mugshot next to headline "child murders" are the

5    worst cases she covered, omitting this was not Pl.'s charge, committed **libel per se** under CA

6    Civ. Code § 45.

7    78. Def. LaVoice's actions, after acknowledging timelines did not match and investigators did not

8    think Pl. committed the unsolved murders, in associating Pl. with the unsolved murders, and

9    stating "overloaded," "understaffed" investigators had "not done enough [to determine Pl.'s

10    guilt]," committed **libel per se** under CA Civ. Code § 45.

11    79. Def. LaVoice's actions, after Def. debunked Pl.'s 2017 interview claims, in presenting the

12    interview as a true "confession" to murders committed **libel per se** under CA Civ. Code § 45.

13    80. Def. LaVoice's actions in publishing Pl. raped Y. Peña when Pl. had not done this, was not

14    charged/convicted for rape committed **libel per se** under CA Civ. Code § 45.

15    81. Def. KGET17's actions in publishing Pl. "admitted" to 19CM-1882 when Pl. had not entered

16    court pleas/statements committed **libel per se** under CA Civ. Code § 45.

17    82. Def. LaVoice's actions, after acknowledging Billy lied, in still including Billy's interview

18    stating Pl. was pre-meditated in 19CM-1882, committed **libel per se** under CA Civ. Code § 45.

19    83. Def. LaVoice's actions in publishing Jane's statements that were false, contradicted official

20    records, had no supporting evidence, enabled/contributed to Def. characterizing Pl. as a

21    domestic/child abuser, had knowingly, wantonly put a target on Pl.'s back with inmates,

22    committed **libel per se** under CA Civ. Code § 45.

23    84. Def. LaVoice's actions, after omitting Pl.'s competency and sanity hearings, hospitalizations,

24    expert-tested diagnoses, in continuing to discredit/sow doubts about Pl.'s mental illnesses, that

25    it was "just another identity of [Pl.'s]," harming Pl.'s reputation with negatively influencing

26    public/staff, causing Pl. extreme emotional distress, committed **libel** under CA Civ. Code § 45.

27    85. Def. LaVoice's actions, after acknowledging she was not supposed to have 19CM-1882

28    photos, in using the materials in *MWATF* to contribute to Def.'s characterization of Pl. as pre-

1    meditated/the aggressor, as violent, likening Pl. to serial killers, as herein alleged, had violated

2    a court order, and committed **libel per se** under CA Civ. Code § 45.

3    86. Def. KGET17's actions in headling/referring to Pl. as "monster," "notorious," inter alia, and

4    had omitted facts favorable to Pl., caused Pl. extreme emotional distress, resulted in death

5    threats against/calls for violence against Pl. committed **libel** under CA Civ. Code § 45.

6    87. Def. KGET17, having editorial control, exhibited negligence when Def. failed to exercise

7    reasonable care to verify statements and instead ratified the libelous materials cited in

8    paragraphs 80-86, which Def.'s staff produced when acting within the scope of their

9    employment. Def. continued/continues republishing, distributing or licensing, inter alia, this

10    material even after being on notice of falsities, biases against Pl., inter alia, and did/do so with

11    an intent to further Def.'s financial gain. Def. under the doctrine of respondeat superior is liable

12    respectively for **libel** or **libel per se** under CA Civ. Code § 45.

13    88. Def. Nexstar, when having editorial control, exhibited negligence when Def. failed to exercise

14    reasonable care to verify statements and instead ratified the libelous materials cited in

15    paragraphs 80-86, which Def.'s staff/station produced when acting within the scope of their

16    employment. Def. continued/continues republishing, distributing or licensing, inter alia, the

17    material even after being on notice of falsities, biases against Pl., inter alia, and did/do so with

18    an intent to further Def.'s financial gain. Def. under the doctrine of respondeat superior is liable

19    respectively for **libel** or **libel per se** under CA Civ. Code § 45.

20    89. In committing the acts alleged herein, Def. LaVoice is guilty of oppression/fraud/malice within

21    the meaning of CA Civ. Code § 3294, entitling Pl. to punitive or exemplary damages.

22    **SECOND CAUSE OF ACTION: CAL. CONST. ART. 1, § 1; PRIVACY CLAUSE**

23    90.  Pl. realleges and incorporates paragraphs 1-89 as though fully set herein.

24    91. Def. LaVoice's actions in publishing about Pl.'s sex-life/son's conception violated Pl.'s right to

25    privacy guaranteed under Cal. Const. Art. 1, § 1.

26    92. Def. LaVoice's actions in publishing hearsay allegations about Pl. being sexually molested as a

27    child violated Pl.'s right to privacy guaranteed under Cal. Const. Art. 1, § 1.

28    93. Def. LaVoice's actions, after acknowledging, "Yes, you are correct! It is not public

1    information" during her discussing Pl.'s/his family's finances, asking Pl.'s attorney about

2    payment, publishing about Pl.'s private life because she "finds it interesting," violated Pl.'s

3    right to privacy guaranteed under Cal. Const. Art. 1, § 1.

4    94. Def. KGET17's actions, when having editorial control, implicitly authorized and ratified the

5    privacy invasions of paragraphs 91-92, committed under the scope of/for Def. KGET17's

6    employment. Def. implicitly authorized, ratified such invasions of privacy with an intent to

7    further Def.'s financial gain. Def. under the doctrine of respondeat superior is liable for

8    violating Pl.'s right to privacy guaranteed under Cal. Const. Art. 1, § 1.

9    95. Def. Nexstar's actions, when having editorial control, implicitly authorized and ratified the

10    privacy invasions of paragraphs 91-92, committed under the scope of/for Def. Nexstar's

11    employment. Def. implicitly authorized, ratified such invasions of privacy with an intent to

12    further Def.'s financial gain. Def. under the doctrine of respondeat superior is liable for

13    violating Pl.'s right to privacy guaranteed under Cal. Const. Art. 1, § 1.

14    **THIRD CAUSE OF ACTION: CA CIV. CODE § 3344; FOR USE OF LIKENESS**

15    96. Pl. realleges and incorporates paragraphs 1-95 as though fully set herein.

16    97. Def. LaVoice's actions, without Pl.'s permission, in using Pl.'s likeness for, and in promotion

17    of, *MWATF*, a defamatory/biased work on Pl., is liable under CA Civ. Code § 3344.

18    98. Def. KGET17's actions, without Pl.'s permission, in using Pl.'s likeness for, and in promotion

19    of, *MWATF*, a defamatory/biased work on Pl., is liable under CA Civ. Code § 3344.

20    99. Def. Nexstar's actions, when having editorial control, implicitly authorized and ratified the

21    unauthorized commercial use of Pl.'s likeness, described in paragraphs 97-98, for/under the

22    scope of Def. Nexstar's employment, and did so with an intent to further Def.'s financial gain.

23    Def. under the doctrine of respondeat superior is liable under CA Civ. Code § 3344.

24    **FOURTH CAUSE OF ACTION: CA CIV. CODE § 56.36(3)(A); USE OF MEDICAL**

25    **INFORMATION FOR FINANCIAL GAIN**

26    100.  Pl. realleges and incorporates paragraphs 1-99 as though fully set herein.

27    101. Def. LaVoice's actions, after being on notice of medical privacy laws, in disclosing Pl.'s

28    medical information for financial gain is liable under CA Civ. Code § 56.36(3)(A).

1  102. Def. KGET17's actions, when having editorial control, implicitly authorized and ratified the

2  use of Pl.'s medical information for financial gain, which was done while Def. LaVoice acted

3  under the scope of her employment. Def. KGET17 implicitly authorized, ratified such

4  disclosure with an intent to further Def.'s KGET17's financial gain. Def. under the doctrine of

5  respondeat superior is liable under CA Civ. Code § 56.36(3)(A).

6  103. Def. Nexstar's actions, when having editorial control, implicitly authorized, ratified the use of

7  Pl.'s medical information for financial gain, as herein described, which was done while Defs.

8  LaVoice, KGET17 acted under the scope of/for employment with Def. Nexstar. Def. Nexstar

9  under the doctrine of respondeat superior is liable under CA Civ. Code § 56.36(3)(A).

10  **FIFTH CAUSE OF ACTION: RESTAT. (SEC.) OF TORTS § 652(E); FALSE LIGHT**

11  104. Pl. realleges and incorporates paragraphs 1-103 as though fully set herein.

12  105. Def. LaVoice's actions, after she sought Pl.'s response, in publishing Pl.'s letters/art as if

13  unexpected pursuit, stating she "never did write" Pl., likening Pl. to the Joker, then agreeing

14  Pl. viewed Def. as Harley Quinn, causing Pl. extreme emotional distress and irreparable harm

15  to his reputation, committed false light placement under Restat. (Sec.) of Torts § 652(E). A

16  reasonable man in Pl.'s position would have found Def.'s actions highly offensive, damaging.

17  106. Def. LaVoice's actions, after omitting others' TROs/charges, inter alia, omitting information

18  favorable to Pl., included false charges with reckless disregard for the truth, caused Pl.

19  extreme emotional distress, and irreparable harm to his reputation, committed false light

20  placement under Restat. (Sec.) of Torts § 652(E). A reasonable man in Pl.'s position would

21  have found Def.'s actions highly offensive, damaging.

22  107. Def. LaVoice's actions, after notice of lies, inaccuracies, inter alia, in accepting, using

23  RTDNA's award to promote *MWATF,* caused Pl. extreme emotional distress, irreparable harm

24  to his reputation, committed false light placement under Restat. (Sec.) of Torts § 652(E). A

25  reasonable man in Pl.'s position would have found Def.'s actions highly offensive, damaging.

26  108. Def. LaVoice's actions in misleading Pl.'s family to get *MWATF* interviews, which interviews

27  built Def.'s credibility, and later stating biased/defamatory *MWATF* was to "take the narrative

28  away from Pl." caused Pl. extreme emotional distress, irreparable harm to his reputation,

1  committed false light placement under Restat. (Sec.) of Torts § 652(E). A reasonable man in

2  Pl.'s position would have found Def.'s actions highly offensive, damaging.

3  109. Def. KGET17's actions, after being on notice of staff's biasedness against Pl., inter alia, in

4  nominating *MWATF* for and using RTDNA's award to promote *MWATF*, omitting Def. paid

5  for the entry, caused Pl. extreme emotional distress, irreparable harm to his reputation,

6  committed false light placement under Restat. (Sec.) of Torts § 652(E). A reasonable person

7  in Pl.'s position would have found Def.'s actions highly offensive, damaging.

8  110. Def. Nexstar's actions, when having editorial control, implicitly authorized and ratified the

9  material described in paragraphs 106-109, done for/under the scope of Def.'s employment.

10  Def. did so with an intent to further Def.'s financial gain. Def. under the doctrine of

11  respondeat superior is liable for false light placement under Restat. (Sec.) of Torts § 652(E).

12  **SIXTH CAUSE OF ACTION: CIVIL HARASSMENT**

13  111. Pl. realleges and incorporates paragraphs 1-110 as though fully set herein.

14  112. Def. LaVoice's actions in publishing about Pl. around fifty times; giving interviews about Pl.;

15  in contacting Pl.'s legal teams, even over "500 times" in one month, contacting inmates, and

16  Pl.'s estranged/distant relatives, et al; discussing online about Pl.'s private life, finances, who

17  Pl. "has in his life" now because she "finds it interesting," "is more invested than most" in Pl.,

18  caused Pl. substantial emotional distress, and constituted civil harassment. A reasonable

19  person in Pl.'s circumstances would have experienced substantial emotional distress.

20  113. Def. LaVoice's actions in allegedly circumventing CDCR policy on D. Baltierra's behalf,

21  giving an alleged defamatory interviews about Pl. with D. Baltierra, publishing Pl. was "a

22  monster" with her unsupported belief Pl. received money/support as a reason for the public to

23  donate to D. Baltierra caused Pl. substantial emotional distress, constituted civil harassment. A

24  reasonable person in Pl.'s position would have experienced substantial emotional distress.

25  114. Def. LaVoice's actions, in posting to Danielle Kirsty's more empathic video under the alleged

26  guise of copyright infringement, not doing the same to content creators not empathetic to Pl.,

27  naming Matthew Cox's interview the same title as Danielle Kirsty's video, all allegedly to

28  divert traffic to Def. and for the alleged purpose of controlling a negative narrative/public

1    perception of Pl., caused Pl. substantial emotional distress, constituted civil harassment. A

2    reasonable person in Pl.'s position would have experienced substantial emotional distress.

3    **SEVENTH CAUSE OF ACTION FOR CA CIV. CODE § 1689; RECISSION**

4    115. Pl. realleges and incorporates paragraphs 1-114 as though fully set herein

5    116. Def. LaVoice's actions, after notice of Pl.'s sanity hearings, inter alia, and pursuant to CA

6    Civ. Code § 39, in recording Pl. for a media interview, which Def., without Pl.'s

7    authorization, had distributed, derived, inter alia, is subject to recission of Pl.'s

8    consent/contract under CA Civ. Code § 1689(b).

9    117. Def. KGET17's actions, after notice of Pl.'s sanity hearings, inter alia, and pursuant to CA

10    Civ. Code § 39, in recording Pl. for a media interview, which Def., without Pl.'s

11    authorization, had distributed, derived, inter alia, is subject to recission of Pl.'s

12    consent/contract under CA Civ. Code § 1689(b).

13    118. Def. Nexstar's actions, after notice of Pl.'s sanity hearings, inter alia, and pursuant to CA

14    Civ. Code § 39, in recording Pl. for a media interview, which Def., without Pl.'s

15    authorization, distributed, derived, inter alia, is subject to recission of Pl.'s consent/contract

16    under CA Civ. Code § 1689(b).

17    **EIGHTH CAUSE OF ACTION: 17 U.S.C. § 501, ET SEQ., FOR COPYRIGHT**

18    119. Pl. realleges and incorporates paragraphs 1-118 as though fully set herein.

19    120. Def. LaVoice's actions, without Pl.'s authorization, in publishing Pl.'s private letters/art for

20    non-news *MWATF*, and or other materials, violated Pl.'s copyright when Pl. is the sole owner

21    of the copyright in an original work that is fixed in tangible media of expression under case

22    no./registration 1-14734254275. Pl. is the holder of the exclusive rights under 17 U.S.C. §

23    101 et. seq., and all amendments thereto, (the "Copyright Act"), to reproduce, distribute,

24    license any reproduction, display, inter alia, Pl.'s work. Def.'s acts violated Pl.'s exclusive

25    rights under 17 U.S.C. §§ 106, 501. Def. infringed on Pl.'s copyright with an intent to

26    financially gain. Based on Def.'s unlawful, infringing actions alleged herein, Pl. is entitled to

27    injunctive relief, Def.'s profits, or at Pl.'s election, statutory damages pursuant under 17

28    U.S.C. §§ 502, 504(b), (c).

*OSUNA V. LAVOICE, ET AL*

1    121. Def. LaVoice's actions, without Pl.'s authorization, in publishing/using Pl.'s private/personal

2        photos for non-news *MWATF*, and or other materials, violated Pl.'s copyright when Pl. is the

3        sole owner of the copyright in an original work that is fixed in tangible media of expression

4        under case no./registration 1-14736572771. Pl. is the holder of the exclusive rights under the

5        Copyright Act to reproduce, distribute, license any reproduction, display, inter alia, Pl.'s

6        work. Def.'s acts violated Pl.'s exclusive rights under 17 U.S.C. §§ 106, 501. Def. infringed

7        on Pl.'s copyright with an intent to financially gain. Based on Def.'s unlawful, infringing

8        actions alleged herein, Pl. is entitled to injunctive relief, Def.'s profits or at Pl.'s election,

9        statutory damages pursuant under 17 U.S.C. §§ 502, 504(b), (c).

10   122. Def. LaVoice's actions, without Pl.'s authorization, in using the text/writing from Pl.'s

11       writing/art for non-news *MWATF*, and or other materials, violated Pl.'s copyright when Pl. is

12       the sole owner of the copyright in an original work that is fixed in tangible media of

13       expression under case no./registration 1-14734282953. Pl. is the holder of the exclusive

14       rights under the Copyright Act to reproduce, distribute, license any reproduction, display,

15       inter alia, Pl.'s work. Def.'s acts violated Pl.'s exclusive rights under 17 U.S.C. §§ 106, 501.

16       Def. infringed on Pl.'s copyright with an intent to financially gain. Based on Def.'s unlawful,

17       infringing actions alleged herein, Pl. is entitled to injunctive relief, Def.'s profits, or at Pl.'s

18       election, statutory damages pursuant under 17 U.S.C. §§ 502, 504(b), (c).

19   123. Def. LaVoice's actions, without Pl.'s authorization, in publishing Pl.'s spoken words from

20       the 2017 interview for non-news *MWATF*, and or other materials, violated Pl.'s copyright

21       when Pl. is the sole owner of the copyright in an original work that is fixed in tangible media

22       of expression under case nos./registrations 1-14767108071, 1-14778251341. Pl. is the holder

23       of the exclusive rights under the Copyright Act to reproduce, distribute, license, display, inter

24       alia, Pl.'s work. Def.'s acts violated Pl.'s exclusive rights under 17 U.S.C. §§ 106, 501. Def.

25       infringed on Pl.'s copyright with an intent to financially gain. Based on Def.'s unlawful,

26       infringing actions alleged herein, Pl. is entitled to injunctive relief, Def.'s profits or at Pl.'s

27       election, statutory damages pursuant under 17 U.S.C. §§ 502, 504(b), (c).

28   124. Def. KGET17's actions, without Pl.'s authorization, in publishing Pl.'s private letters/art for

1   non-news *MWATF*, and or other materials, violated Pl.'s copyright when Pl. is the sole owner

2   of the copyright in an original work that is fixed in tangible media of expression under case

3   no./registration 1-14734254275. Pl. is the holder of the exclusive rights under the Copyright

4   Act, to reproduce, distribute, display, license any reproduction, display, inter alia, Pl.'s work.

5   Def.'s acts violated Pl.'s exclusive rights under 17 U.S.C. §§ 106, 501. Def. infringed on

6   Pl.'s copyright with an intent to financially gain. Based on Def.'s unlawful, infringing actions

7   alleged herein, Pl. is entitled to injunctive relief, Def.'s profits, or at Pl.'s election, statutory

8   damages pursuant under 17 U.S.C. §§ 502, 504(b), (c).

9   125. Def. KGET17's actions, without Pl.'s authorization, in publishing Pl.'s private/personal

10   photos, for non-news *MWATF*, and other materials, violated Pl.'s copyright when Pl. is the

11   sole owner of the copyright in an original work that is fixed in tangible media of expression

12   under case no./registration 1-14736572771. Pl. is the holder of the exclusive rights under the

13   Copyright Act to reproduce, distribute, license any reproduction, display, inter alia, Pl.'s

14   work. Def.'s acts violated Pl.'s exclusive rights under 17 U.S.C. §§ 106, 501. Def. infringed

15   on Pl.'s copyright with an intent to financially gain. Based on Def.'s unlawful, infringing

16   actions alleged herein, Pl. is entitled to injunctive relief, Def.'s profits, or at Pl.'s election,

17   statutory damages pursuant under 17 U.S.C. §§ 502, 504(b), (c).

18   126. Def. KGET17's actions, without Pl.'s authorization, in using the text/writing from Pl.'s

19   writing/art to create, promote, inter alia, non-news *MWATF* and a defamatory native ad

20   article, and or other materials, violated Pl.'s copyright when Pl. is the sole owner of the

21   copyright in an original work that is fixed in tangible media of expression under case

22   no./registration 1-14734282953. Pl. is the holder of the exclusive rights under the Copyright

23   Act to reproduce, distribute, license any reproduction, display, inter alia, Pl.'s work. Def.'s

24   acts violated Pl.'s exclusive rights under 17 U.S.C. §§ 106, 501. Def. infringed on Pl.'s

25   copyright with an intent to financially gain. Based on Def.'s unlawful, infringing actions

26   alleged herein, Pl. is entitled to injunctive relief, Def.'s profits, or at Pl.'s election, statutory

27   damages pursuant under 17 U.S.C. §§ 502, 504(b), (c).

28   127. Def. KGET17's actions, without Pl.'s authorization, in publishing Pl.'s spoke words from the

*OSUNA V. LAVOICE, ET AL*

1 2017 interview for non-news *MWATF*, and or other materials, violated Pl.'s copyright when

2 Pl. is the sole owner of the copyright in an original work that is fixed in tangible media of

3 expression under case nos./registrations 1-14767108071, 1-14778251341. Pl. is the holder of

4 the exclusive rights under the Copyright Act to reproduce, distribute, license, display, inter

5 alia Pl.'s work. Def.'s acts violated Pl.'s exclusive rights under 17 U.S.C. §§ 106, 501. Def.

6 infringed on Pl.'s copyright with an intent to financially gain. Based on Def.'s unlawful,

7 infringing actions alleged herein, Pl. is entitled to injunctive relief, Def.'s profits or at Pl.'s

8 election, statutory damages pursuant under 17 U.S.C. §§ 502, 504(b), (c).

9 128. Def. Nexstar's actions, when having editorial control, implicitly authorized and ratified the

10 copyright infringements described in paragraphs 119-127, for case nos./registrations 1-

11 14736572771, 1-14734282953, 1-14734254275, 1-14767108071, 1-14778251341, which

12 was done for/under the scope of Def. Nexstar's employment. Def. implicitly authorized,

13 ratified such copyright infringements with an intent to further Def.'s financial gain. Def.

14 under the doctrine of respondeat superior is liable for infringement under the Copyright Act.

### VI. PRAYER FOR RELIEF

16 WHEREFORE, Pl. respectfully requests that the Court grant the following relief:

17 **A. Issue declaratory judgement statements.**

18 **B. Issue compensatory damages:**

19 a. For compensatory damages in an amount to be proven at Trial.

20 b. For all punitive damages in an amount appropriate to punish the Def. and make an example of

21 the Def. to the community.

22 c. For any general/specific/consequential/incidental damages in an amount to be proven at Trial.

23 d. For all nominal damages.

24 e. For all interests, where/as permitted by law.

25 **C. Issue injunction orders to:**

26 f. For a notice to be issued to Kings County DA/Superior Court for any of Def.'s materials found

27 using, distributing, inter alia, any sealed/confidential 19CM-1882 materials with a

28 recommendation for charges/punishments appropriate under 18 U.S.C. § 401/other laws.

1    g. For any of Def.'s materials that infringe on Pl.'s copyrights and any other materials that contain

2      or embody copies of Pl.'s original works be impounded pursuant to 17 U.S.C. § 503; materials

3      found infringing on Pl.'s copyrights, as well as any other that contain embodiments of Pl.'s

4      original works be destroyed pursuant to 17 U.S.C. § 503.

5    h. For an order enjoining Defs., any agents/agencies actings in concert/conspiracy with Defs.,

6      temporarily during the pendency of the action and permanent thereafter from 1.)

7      infringing/contributing to, participating in infringement by others of copyright works or

8      aiding/abetting others to infringe said copyrights in any manner 2.) copying, duplicating,

9      selling, deriving, licensing, displaying, distributing, otherwise using without authorization

10      copies of the works to which Pl. is the owner of exclusive rights under the respective copyrights

11      and derivative works based on them.

12    i. For an order of destruction for all materials found defamatory or in any other violation.

13    j. For an order for Defs. to issue an apology to Pl. across all their platforms at peak hours with an

14      explanation about any violations found by this Court, which apology shall not be deleted and

15      **shall not be used to:** advertise *MWATF*; advertise/memorialize/fundraise for Y. Peña/family.

16    k. For an order of recission of Pl.'s 2017 interview any consent/contract(s) between Defs. and Pl.,

17      to destroy the interview and any derivative works, inter alia, upon recission.

18    l. For an order to enjoin Def. LaVoice or any agent/agency on Def.'s behalf from

19      publishing/publicly speaking about Pl. during the pendency of 19CM-1882, appeals, pending

20      cases, charges to 1.) prevent further unfair disadvantage, damage to Pl. 2.) halt further civil

21      harassment of Pl.

22    **D. GRANT any such other relief as may appear that Pl. is entitled.**

23                  **DEMAND FOR JURY TRIAL**

24    Pl. demands a trial by jury on all issues triable by jury.

25    Verified and submitted on February 18, 2025,

26

27

28    p.p. Jamie Osuna, CDCR # BD0868

         *OSUNA V. LAVOICE, ET AL*